UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA

JULIE ANN MCBRIDE,                    )
                                      )
          Plaintiff,                  )
                                      )
     v.                               )        CIVIL NO.  1:15cv186
                                      )
CAROLYN W. COLVIN, Acting             )
Commissioner of Social Security,      )
                                      )
          Defendant.                  )

OPINION AND ORDER

This matter is before the court for judicial review of a final decision of the defendant
Commissioner of Social Security Administration denying Plaintiff's application for Disability
Insurance Benefits, 42 U.S.C. § 401 *et seq*.  Section 205(g) of the Act provides, *inter alia*, "[a]s
part of his answer, the [Commissioner] shall file a certified copy of the transcript of the record
including the evidence upon which the findings and decision complained of are based.  The court
shall have the power to enter, upon the pleadings and transcript of the record, a judgment
affirming, modifying, or reversing the decision of the [Commissioner], with or without
remanding the case for a rehearing."  It also provides, "[t]he findings of the [Commissioner] as to
any fact, if supported by substantial evidence, shall be conclusive. . . ."  42 U.S.C. §405(g).The
law provides that an applicant for disability insurance benefits must establish an "inability to
engage in any substantial gainful activity by reason of any medically determinable physical or
mental impairment which can be expected to last for a continuous period of not less than 12
months. . . ."  42 U.S.C. §416(i)(1); 42 U.S.C. §423(d)(1)(A).  A physical or mental impairment
is "an impairment that results from anatomical, physiological, or psychological abnormalities
which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."

42 U.S.C. §423(d)(3). It is not enough for a plaintiff to establish that an impairment exists. It must be shown that the impairment is severe enough to preclude the plaintiff from engaging in substantial gainful activity. Gotshaw v. Ribicoff, 307 F.2d 840 (7th Cir. 1962), cert. denied, 372 U.S. 945 (1963); Garcia v. Califano, 463 F.Supp. 1098 (N.D.Ill. 1979). It is well established that the burden of proving entitlement to disability insurance benefits is on the plaintiff. See Jeralds v. Richardson, 445 F.2d 36 (7th Cir. 1971); Kutchman v. Cohen, 425 F.2d 20 (7th Cir. 1970).

Given the foregoing framework, "[t]he question before [this court] is whether the record as a whole contains substantial evidence to support the [Commissioner's] findings." Garfield v. Schweiker, 732 F.2d 605, 607 (7th Cir. 1984) citing Whitney v. Schweiker, 695 F.2d 784, 786 (7th Cir. 1982); 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984) quoting Richardson v. Perales, 402 U.S. 389, 401, 91 S.Ct. 1410, 1427 (1971); see Allen v. Weinberger, 552 F.2d 781, 784 (7th Cir. 1977). "If the record contains such support [it] must [be] affirmed, 42 U.S.C. §405(g), unless there has been an error of law." Garfield, supra at 607; see also Schnoll v. Harris, 636 F.2d 1146, 1150 (7th Cir. 1980).

In the present matter, after consideration of the entire record, the Administrative Law Judge ("ALJ") made the following findings:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.    The claimant has not engaged in substantial gainful activity since June 5, 2012, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.    The claimant has the following severe impairments: discogenic back;

fibromyalgia; obesity; and headaches/migraines (20 CFR 404.1520(c)).

4.     The claimant does not have an impairment or combination of impairments that meets or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) , 404.1525, and 404.1526).

5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to lift, carry, push and pull 10 pounds frequently, sit for six hours in an eight-hour workday, stand/walk for two hours in an eight-hour workday, occasionally climb ladders, ropes, scaffolds, ramps and stairs, occasionally balance, stoop, kneel, crouch and crawl, and must avoid concentrated exposure to excessive noise, excessive vibration, and pulmonary irritants such as fumes, odors, dust and gases.

6.     The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.     The claimant was born on November 9, 1976, and was 35 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563).

8.     The claimant has at least a high school education (GED) and is able to communicate in English (20 CFR 404.1564).

9.     Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.    Considering the claimant's age, education, work experience and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.    The claimant has not been under a disability, as defined in the Social Security Act, from June 5, 2012, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 14-22)

Based upon these findings, the ALJ determined that Plaintiff was not entitled to disability insurance benefits. The ALJ's decision became the final agency decision when the Appeals Council denied review. This appeal followed.

Plaintiff filed her opening brief on February 1, 2016. On May 9, 2016, the defendant filed a memorandum in support of the Commissioner's decision, and on May 23, 2016, Plaintiff filed her reply. Upon full review of the record in this cause, this court is of the view that the Commissioner's decision should be remanded.

A five step test has been established to determine whether a claimant is disabled. See Singleton v. Bowen, 841 F.2d 710, 711 (7th Cir. 1988); Bowen v. Yuckert, 107 S.Ct. 2287, 2290-91 (1987). The United States Court of Appeals for the Seventh Circuit has summarized that test as follows:

> The following steps are addressed in order: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment "severe"? (3) Does the impairment meet or exceed one of a list of specific impairments? (4) Is the claimant unable to perform his or her former occupation? (5) Is the claimant unable to perform any other work within the economy? An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the claimant is not disabled.

Nelson v. Bowen, 855 F.2d 503, 504 n.2 (7th Cir. 1988); Zalewski v. Heckler, 760 F.2d 160, 162 n.2 (7th Cir. 1985); accord Halvorsen v. Heckler, 743 F.2d 1221 (7th Cir. 1984). From the nature of the ALJ's decision to deny benefits, it is clear that step five was the determinative inquiry.

Plaintiff filed her application for disability benefits May 13, 2012, alleging disability beginning March 25, 2012 (Tr. 124-25). On behalf of SSA, the State disability determination service denied Plaintiff's application initially and upon reconsideration (Tr. 72-77, 81-87). In response to a timely filed request, ALJ Patricia Melvin held a hearing on October 9, 2013. Plaintiff appeared and testified at the hearing. She was represented by attorney Thomas Knight

(Tr. 31-71). On March 5, 2014, ALJ Melvin issued a decision finding that Plaintiff was not disabled as defined in the Social Security Act (Tr. 9-30). Plaintiff asked the Appeals Council to review the decision, and on May 19, 2015, the Appeals Council denied her request (Tr. 1-7). Thereafter, Plaintiff timely filed her complaint in this Court pursuant to 42 U.S.C. § 405(g).

Plaintiff has had two back surgeries and has been diagnosed with cervical and thoracic degenerative disk disease, spondylosis, and facet arthropathy (Tr. 663, 671, 681, 691, 778), status post L3 through S1 fusion (Tr. 663, 671, 681, 691, 728, 736), post-laminectomy pain syndrome (Tr. 663, 671, 681, 691, 699, 718, 728, 739), failed back syndrome (Tr. 809, 871), fibromyalgia and obesity (Tr. 663, 671, 681,691, 699, 718, 728, 733, 739), chronic pain syndrome and incontinence (Tr. 382, 410, 661, 733, 813, 818, 964), mild sleep apnea (Tr. 655, 658), chronic sinus disease (Tr. 420, 518-22, 544-48, 652, 691, 697, 716), and hypothyroidism  (Tr. 621, 638, 913). She used a walker at times and had a prescription cane (Tr. 934) and a back brace (Tr. 671).

She also has psychological diagnoses. Plaintiff's treatment for depression was handled through her primary care physician for many years (Tr. 515, 543, 554, 567, 599, 601, 603-15, 621, 625-26, 630, 637-28, 648, 654, 657, 716, 733). Her primary care doctor referred her for psychiatric evaluation in July of 2012 (Tr. 638). At that time, Plaintiff was not ready to engage in psychological treatment, but in November 2012, she was seen for an intake evaluation of the Northeastern Center (NEC) and she was seen regularly thereafter (Tr. 931).

When Plaintiff was initially evaluated at NEC in November 2012, she reported experiencing emotionality, poor concentration, social isolation, fatigue, grief, appetite disturbance, elevated mood, obsessions/compulsions, panic attacks, fears, weight gain/loss, suicidal and homicidal thoughts with a lot of depressed mood, hopeless and feeling overwhelmed,

anxiety and worry, irritability, feelings of guilt, mood swings, elevated mood, and sleep disturbances (Tr. 931). She also reported experiencing emotional, physical, and sexual abuse in the past which she believed caused her difficulties with interpersonal communication and relationships (Tr. 931). Over the course of therapy, Plaintiff's therapist has noted that she has a history of self-harm and was engaging in daily activities to induce "pain caused by excessive physical strains on her body" (Tr. 930).

In January 2014, after meeting with Plaintiff on a regular basis for over a year, Plaintiff's therapist stated that she was exhibiting many borderline traits and needed DBT treatments, but she was unable to attend due to cost (Tr. 953). The personality disorder was causing problems with interpersonal relationships and emotional regulation (Tr. 953). Even before the therapist formally identified the personality disorder, she referred to "BPD" traits and difficulties caused by those traits (Tr. 929).

Before she began having significant health problems, Plaintiff worked steadily, earning over $35,000 per year until her health required her to cut back her hours (Tr. 133). After filing for benefits, Plaintiff was seen by a psychologist at the request of the Agency (Tr. 575-78). When Plaintiff presented for the consultative psychological evaluation, she appeared to be focused on her physical impairments, which is consistent with her other medical records showing that her pain was a primary concern (Tr. 575). Nonetheless, the psychologist was able to glean that she was suffering from a psychological impairment, which he labeled "cyclothymic disorder," and he opined that "her attendance and productivity would likely be poor" (Tr. 576). He assigned a Global Assessment of Functioning (GAF) score of 55 (Tr. 576). A GAF score of 51-60 is indicative of moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic

attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed., text rev. 2000, p. 34) (DSM-IV-TR).

In June 2012, Plaintiff presented for a consultative medical examination and reported chronic back problems, fibromyalgia, migraines, tremors, muscle spasms, and her legs giving out requiring use of a walker when walking any distance (Tr. 571). She was 69 inches tall and weighed 317 pounds. Her ambulation was slow, and she had pain generalized all over, worse in the lumbar area and sacroiliac region. The doctor detected the typical fibromyalgia tender points, and noted that Plaintiff's range of motion of the cervical and lumbar spine and hips was reduced, but was normal in other joints. He did not give a functional opinion (Ex. 571-74).

State agency physicians reviewed the evidence in August 2012 and November 2012 and concluded that Plaintiff could perform sedentary work with occasional postural movements and avoiding concentrated exposure to noise, vibration, and fumes, odors, dusts and gases (Tr. 640-47, 749). The State agency psychologists found Plaintiff's mental impairments were not severe (Tr. 579-92, 750).

There are no formal treating source opinions pertaining to the relevant time period. However, during an intake evaluation at the Northeastern Center (NEC), the therapist diagnosed a major depressive disorder and assigned a GAF of 45 (Tr. 931). A GAF 41-50 is indicative of serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or a serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *See* DSM-IV-TR p. 34. The intake assessment is cosigned by a physician (Tr. 931).

In support of remand or reversal, Plaintiff  argues that the vocational findings are founded

upon legal error and are not supported by substantial evidence. More specifically, Plaintiff argues that the new evidence submitted to the Appeals Council requires remand or reversal of the ALJ's decision.

The issue of whether the Appeals Council properly rejected a request for review is different than whether an ALJ's decision is supported by substantial evidence. *Farrell v. Astrue*, 692 F.3d 767, 770-71 (7th Cir. 2012). Evidence submitted to the Appeals Council is evaluated only if it is "new and material" and "relates to the period on or before the date of the [ALJ] hearing decision." 20 C.F.R. § 404.970. If the new evidence meets these criteria, the Appeals Council must incorporate that evidence into the record and evaluate the entire record, "including the new and material evidence" to determine whether the ALJ's conclusions are "contrary to the weight of the evidence" in the supplemented record. If it is, the Appeals Council must conduct a *de novo* review of the ALJ's decision. *Id*. If the evidence does not meet the regulatory criteria or the ALJ's decision is not contrary to the weight of the evidence, the request for review is denied.

On appeal to the district court, the status of the new evidence and the scope of the court's review of the Appeals Council's denial depends upon the grounds given by the Appeals Council. *See Stepp v. Colvin*, 795 F.3d 711 (7th Cir. 2015). If the Appeals Council denies review because new evidence is nonqualifying under the regulations, the Court conducts a *de novo* review of whether the evidence was relevant under the regulations. *Farrell v. Astrue*, 692 F.3d 767, 771 (7th Cir.2012). If the Court finds that the evidence is new, material, and time-relevant, an error of law exists and remand may be appropriate. *Perkins*, 107 F.3d at 1294. Conversely, if the Appeals Council found the new evidence was relevant under the regulatory criteria, but denied review because the ALJ's decision was not contrary to the weight of the evidence, then "the Council's

decision whether to review is discretionary and unreviewable." *Id.*

In the present case, Plaintiff argues that the former scenario applies and that the Appeals Council committed an error of law in denying Plaintiff's Request for Review without considering whether the ALJ's decision was contrary to the weight of the evidence, including the newly submitted records. The Appeals Council boilerplate decision states:

> In looking at your case, we considered the reasons you disagree with the decision and the additional evidence listed on the enclosed Order of Appeals Council.
>
> We considered whether the Administrative Law Judge's action, findings or conclusion is contrary to the weight of the evidence of record.
> We found that this information does not provide a basis for changing the Administrative Law Judge's decision.
>
> We also looked at medical record from Northeastern Center, dated March 21, 2014 (three pages). The Administrative Law Judge decided your case through March 5, 2014. This new information is about a later time. Therefore. it does not affect the decision about whether you were disabled beginning on or before March 5, 2014.

(Tr. 2) This language is identical to the boilerplate condemned in a recent case decided by the Seventh Circuit. *See Stepp*, 795 F.3d at 718. Faced with similar facts, the Court in *Stepp* concluded that in cases where (1) the Appeals Council summarily denies request for review and (2) the denial contains boilerplate language above, the boilerplate is properly interpreted as an implied finding by the Appeals Council that the new evidence is nonqualifying under the regulation. *Stepp*, 795 F.3d 720. The *Stepp* court rejected the defendant's contention that language in the denial notice and inclusion of the new evidence in the Exhibit List established that the Appeals Council found the evidence new and material. Specifically, the *Stepp* court disagreed with the defendant that the boilerplate statement in the denial—that the Appeals Council had "considered whether the [ALJ's] action, findings, or conclusion is contrary to the weight of

evidence of record"—was sufficiently specific to confirm that the Council had accepted and reviewed the newly submitted evidence and conducted a *de novo* review of the ALJ's decision. *Id*. at 25-26.

In *Stepp*, noting that the facts fell somewhere between *Perkins*, 107 F.3d at 1290 and *Farrell*, the Court found:

> [T]he minimal information provided by the Appeals Council in its denial of Stepp's request for review is insufficient to allow us to determine with any confidence that the Council accepted Dr. MacKay's notes as new and material evidence. While the Commissioner has pointed to a handful of ambiguous references in the order and denial notice that suggest that the Appeals Council may have deemed this evidence qualifying, these references fall considerably short of the Council's express analysis of the newly submitted evidence at issue in *Perkins*. We therefore cannot conclude that these abstruse signals, without more, demonstrate that the Council considered Dr. MacKay's treatment notes. As we did in *Farrell*, "[w]e thus interpret the Appeals Council decision as stating that it has rejected [Stepp's] new evidence as non-qualifying under the regulation." 692 F.3d at 771.

*Stepp*, 795 F.3d at 720. Addressing the issue of whether the evidence was in fact new and material, the Court conducted a de novo review and concluded that the records were "new" because they were "not in existence or available to the claimant at the time of the administrative proceeding" and were "material" because they created a "reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered." *Id*. (citing *Perkins*, 107 F.3d at 1296).

In the present case, as in *Stepp*, the evidence at issue is new in the sense that it was not available at the time of the ALJ's decision and it is material because it reflects the trajectory of Plaintiff's psychological impairments and the observations of her treating sources about her condition. The materiality of the evidence will be discussed below to demonstrate its potential

impact on the ALJ's findings.

Plaintiff argues that the evidence establishes severe psychological impairments. The preponderance of the record as a whole, including the evidence submitted to the Appeals Council, establishes that Plaintiff has severe psychological impairments that cause significant work-related limitations. Based on the evidence before her, the ALJ determined that Plaintiff's medically determinable depression/cyclothymic disorder did not cause more than minimal limitations in her ability to perform basic mental work activities and was, therefore, non-severe (Tr. 15). She further concluded that Plaintiff's post-traumatic stress disorder (PTSD) was not a medically determinable impairment (Tr. 14-15). In reaching her conclusion regarding severity, the ALJ applied the criteria of section 12.00C of 20 C.F.R. Part 404, Subpart P, Appendix 1. See 20 C.F.R. § 1520a. In the areas of activities of daily living, social functioning, and concentration, persistence or pace the ALJ found Plaintiff had mild limitation (Tr. 15). She also determined that there was no evidence of episodes of decompensation of extended duration (Tr. 15). Contrary to the ALJ's findings, the record supports the diagnosis of PTSD and limitations stemming from that impairment, and the record further establishes a personality disorder and depression of greater severity than appreciated by the ALJ. Moreover, evidence submitted to the Appeals Council erases any doubt about the severity of Plaintiff's mental impairments.

Although Plaintiff has struggled with psychiatric impairments since childhood (Tr. 931), the time-line particularly relevant to this case begins around the time she was forced to stop working due to her physical health. Plaintiff's diagnosis and treatment for depression was handled through her primary care physician for many years (Tr. 515, 543, 554, 567, 599, 601, 603-15, 621, 625-26, 630, 637-28, 648, 654, 657, 716, 733). After filing for benefits, she was

seen by a psychologist at the request of the Agency (Tr. 575-78). At that time, both the consulting psychologist and her treating physician noted that Plaintiff was struggling psychologically (Tr. 577, 637-38), and her treating doctor referred her for psychiatric treatment in July of 2012 (Tr. 638). For whatever reason, Plaintiff was not ready to engage in psychological treatment when it was recommended in July, but in November 2012, she was seen for an intake evaluation of the Northeastern Center (NEC) and she was seen regularly thereafter (Tr. 931). Once Plaintiff started in therapy, many of the "discrepancies" or questions about the PTSD were resolved when she opened up about her history of trauma and abuse and the extent of her mental suffering was exposed (Tr. 925, 929, 930-31, 956-57, 9604).

Evidence from NEC that was before the ALJ and from the consultative examiner establishes that Plaintiff's depression was causing far worse than "mild" disruptions of her ability to function in multiple areas and suggests that additional development was necessary to properly evaluate her PTSD. When Plaintiff presented for the consultative psychological evaluation, she appeared to be focused on her physical impairments, which is consistent with her other medical records showing that her pain was a primary concern (Tr. 575). Perhaps for this reason, she gave a rather skeletal psychiatric history in which she mentioned her past diagnosis of PTSD, but she did not elaborate or disclose the abuse she suffered (Tr. 575). Nonetheless, the psychologist was able to glean that she was suffering from a psychological impairment, which he labeled "cyclothymic disorder," and he opined that "her attendance and productivity would likely be poor" (Tr. 576). He assigned a GAF score of 55 (Tr. 576). A GAF score of 51-60 is indicative of moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g.. few friends, conflicts with

peers or co-workers). *See* DSM-IV-TR p. 34.

When Plaintiff was initially evaluated at NEC in November 2012, she reported experiencing emotionality, poor concentration, social isolation, fatigue, grief, appetite disturbance, elevated mood, obsessions/compulsions, panic attacks, fears, weight gain/loss, suicidal and homicidal thoughts with a lot of depressed mood, hopeless and feeling overwhelmed, anxiety and worry, irritability, feelings of guilt, mood swings, elevated mood, and sleep disturbances (Tr. 931). The therapist diagnosed a major depressive disorder and assigned a GAF of 45 (Tr. 931). A GAF 41-50 is indicative of serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or a serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *See* DSM-IV-TR p. 34. This evaluation is consistent with the consultative examination, although it shows some worsening and/or may be indicative of a greater level of disclosure due to the therapeutic rather than investigative setting.

The NEC evidence before the ALJ also demonstrated sufficient evidence of PTSD to support Plaintiff's reports to various providers that she had been diagnosed with the disorder and to raise a question in the ALJ's mind regarding whether further investigation was warranted. At the initial NEC evaluation, Plaintiff reported experiencing emotional, physical, and sexual abuse in the past which she believed caused her difficulties with interpersonal communication and relationships (Tr. 931). While the ALJ was correct in noting that Plaintiff was able to control her symptoms while working, it is not unreasonable or unexpected for the records to demonstrate increased symptomology caused by increased physical pain, financial difficulties, and other stress. The ALJ's disregard of the present symptoms because of the past ability to control them is a

logical error that is unsupported by legal precedent or record evidence. The ALJ should have either identified the PTSD as a medically determinable severe impairment or sought further evidence from an acceptable medical source if she was not satisfied with the value of the evidence in the record. *See* POMS DI 24505.030 Expedients to Evaluate and Develop Evidence for Potential Mental and Physical Impairments. Although Plaintiff went to a consultative examination, that exam was conducted prior to Plaintiff obtaining treatment that enabled her to disclose the abuse she suffered. This is a case in which a second consultative examination with review of the therapeutic record would have been crucial if the ALJ was not satisfied with the treating source records.

Evidence submitted to the Appeals Council further documents the abuse underlying the PTSD and also establishes that Plaintiff was struggling with a personality disorder. By definition, personality disorders do not develop over a short period of time. See 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.08. In January 2014, after meeting with Plaintiff on a regular basis for over a year, Plaintiff's therapist stated that she was exhibiting many borderline traits and needed DBT treatments, but she was unable to attend due to cost (Tr. 953).The personality disorder was causing problems with interpersonal relationships and emotional regulation (Tr. 953).

There is a reasonable probability that the new evidence from NEC would have changed the ALJ's decision. The evidence regarding the BPD traits was before the ALJ because even before the therapist formally identified the personality disorder, she referred to BPD traits and difficulties caused by those traits (Tr. 929). Therefore, there is a reasonable probability that, had the ALJ reviewed the new evidence in conjunction with the record as a whole, knowledge of the

personality disorder in combination with the other psychiatric conditions would have changed her opinion of Plaintiff's mental functioning in at least one area of the "B" criteria, thereby requiring a new formulation of her residual functional capacity and new vocational evidence. Indeed, the new evidence may even change the ALJ's evaluation of Plaintiff's mental functioning to such an extent that a listing may be applicable. In either event, remand is appropriate.

The court notes that Defendant concedes that the Appeals Council committed legal error under *Stepp* when it failed to properly consider new evidence Plaintiff submitted with her request for review. In making this concession, Defendant admits that the new evidence is "new and material." In conceding that the evidence is material, Defendant is admitting that the new evidence created a "reasonable probability that the Commissioner would have reached a different conclusion had the evidence been considered." *Id.* at 720 (citing *Perkins v. Chater*, 107 F.3d 1290, 1296 (7th Cir.1997)). Defendant then asks the Court to disregard the last admission and instead find that the Appeal Council's error was harmless because it does not show that the ALJ's decision was contrary to the weight of the evidence. However, the standard for harmless error is not whether correction of the error would show that the ALJ's decision is contrary to the weight of the evidence.

The correct legal standard for determining whether a legal error is harmless is not nearly as broad as Defendant propounds. The Seventh Circuit has explained that application of the harmless error doctrine is appropriate only "[i]f it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support [that] remanding is

a waste of time." *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). *See also McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) ("[W]e look at the evidence in the record to see if we can predict with great confidence what the result on remand will be."). In the present case, the new evidence answers "inconsistencies" raised by the ALJ such as lack of treatment (inability to afford) and the severity of symptoms, and it shows how her diagnoses evolved as she was able to process psychological trauma in a therapeutic environment.

This is not a case where the new evidence shows a new impairment or where the claimant sought a new opinion for purposes of the litigation. The new evidence in this case shows the authentic evolution of Plaintiff's illness and her providers' growing understanding of her clinical diagnoses and need for treatment. It is likely the ALJ would be persuaded by such evidence, and it is not readily predictable that the ALJ would reach the same conclusion upon remand. Thus, for the reasons discussed above, the court will remand this case.

Next, Plaintiff argues that the ALJ did not properly consider her back impairments, obesity, and fibromyalgia. The ALJ determined that Plaintiff had a severe impairment called "discogenic back" (Tr. 14), but Plaintiff was never given that diagnosis. The only place in the record where the term "discogenic back" is found is in State agency documents (Tr. 72, 640). None of Plaintiff's treating physicians diagnosed discogenic back nor did the consultative examiner. Conversely, the ALJ she did not analyze—or even mention—Plaintiff's actual diagnosed back conditions including cervical and thoracic degenerative disk disease, spondylosis, and facet arthropathy (Tr. 663, 671, 681, 691, 778); status post L3 through S1 fusion (Tr. 663, 671, 681, 691, 728, 736); post-laminectomy pain syndrome (Tr. 663, 671, 681, 691, 699, 718, 728, 739); and failed back syndrome (Tr. 809, 871). Unlike the generic phrase used by the ALJ,

these diagnoses indicate that Plaintiff has impairments of the cervical, thoracic, and lumbar areas of her spine following failed back surgeries. The ALJ's catchall finding that Plaintiff has a medically determinable severe impairment of "discogenic back" is error because it is not based substantial evidence (only on the State agency documents) and it does not accurately and completely describe the extent or severity of her back impairments.

Because of the consolidation of Plaintiff's back impairments into one catchall impairment, it is impossible to determine whether the ALJ considered the distinct diagnoses and resulting limitations. For example, the cervical and thoracic impairments support Plaintiff's reports of limitations in her upper extremities. However, there are no upper extremity limitations in the residual functional capacity finding except for lifting ten pounds frequently—reaching, handling, and fingering are not mentioned nor are neck motion or head postures (Tr. 17).

Additionally, the ALJ erred in summarily determining that Plaintiff's conditions did not meet or medically equal any impairment listed at 20 CFR Part 404, Subpart P, Appendix 1, particularly listing 1.04. If a claimant has an impairment that meets or equals an impairment found in the Listing of Impairments, a claimant is presumptively eligible for benefits. 20 C.F.R. § 404.1520(d). "In considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than perfunctory analysis of the listing." *Barnett*, 381 F.3d at 668. The Listings specify the criteria for qualifying impairments. *Id.* (citing 20 C.F.R. § 404.1525(a)). A claimant may also satisfy a Listing by showing that his impairment is accompanied by symptoms that are equal in severity to those described in the Listing. 20 C.F.R. § 404.1526. A finding of medical equivalence requires an expert's opinion on the issue. *Barnett*, 381 F.3d at 670.

Listing 1.04 describes spinal disorders (including herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, and vertebral fractures), resulting in compromise of a nerve root or the spinal cord, with evidence of nerve root compression, spinal arachnoiditis, or lumbar spinal stenosis resulting in pseudoclaudication. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04. It also requires, in relevant part: "Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test." *Id.*

In determining Plaintiff's multiple spinal diagnoses did not meet or equal Listing 1.04, the ALJ stated:

> The severity of the claimant's back impairment does not meet or medically equal Listing 1.04 (disorders of the spine). The evidence does not establish the presence of nerve root compression, spinal arachnoiditis, or spinal stenosis resulting in pseudoclaudication, as required by that listing.

(Tr. 17). Essentially, the ALJ dismissed the possibility of Plaintiff's complex spinal conditions meeting or equally Listing 1.04's criteria in two sentences.

The Seventh Circuit has repeatedly found this type of perfunctory analysis inadequate to support a finding that an impairment does not meet or equal a Listing. *See Kastner v. Astrue*, 697 F.3d 642, 647-48 (7th Cir. 2012) (remanding where the ALJ's cursory Listing analysis failed to articulate rationale for denying benefits when record supported finding in claimant's favor); *Barnett*, 381 F.3d at 670 (concluding the ALJ's "two-sentence consideration of the Listing of Impairments [was] inadequate and warrant[ed] remand."); *Brindisi v. Barnhart*, 315 F.3d 783,

786 (7th Cir. 2003)(reversing because ALJ's Listing analysis was "devoid of any analysis that would enable meaningful judicial review.").

As in a number of similar cases, the ALJ in this case did not seek an expert's opinion as to whether any of the evidence could support a finding of equivalency. *See Barnett*, 381 F.3d at 670-71 (stating ALJ's assumption of absence of equivalency without any relevant discussion and without consulting an expert's opinion could not support the decision to deny benefits). Because the decision does not contain adequate analysis from either the ALJ or a medical expert, the decision lacks a logical bridge tying the evidence to the conclusion. *See Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005). *See also* Social Security Ruling (SSR) 96-6p.

Further, the ALJ did not properly evaluate Plaintiff's fibromyalgia pursuant to the guidance in SSR 12-2p Titles II and XVI: Evaluation of Fibromyalgia. According to the ruling, when fibromyalgia is established by the medical evidence, as it is in this case, it can be the basis for a finding of disability. *Id.* The ruling also emphasizes the importance of utilizing information from nonmedical sources to aid in evaluating the severity and functional effects of fibromyalgia. *Id*. (citing SSR 06-3p). Longitudinal evidence is particularly important when evaluating fibromyalgia because "symptoms of FM can wax and wane so that a person may have 'bad days and good days.'" *Id*. The SSR also cautions that the widespread pain and other symptoms associated with fibromyalgia can cause mental and physical limitations that may aggravate other conditions and further erode the occupational base at all exertional levels. *Id*.

The ALJ discussed Plaintiff' fibromyalgia, but did not mention SSR 12-2p and did not appear to comprehend how the symptoms of fibromyalgia can severely limit an individual's ability to sustain activities and function consistently. The evidence shows that Plaintiff was

repeatedly evaluated and diagnosed with moderate to severe fibromyalgia (Tr. 663, 671, 681,691, 699, 718, 728, 733, 739). She was prescribed medications—and as the ALJ stated, those medications helped at times. However, the ALJ ignored the fact that sometimes the medication was not effective and that "helped" does not mean cured. The ALJ acknowledged, but chose not to believe, the consistent reports of pain and fatigue found throughout the medical treatment notes, in Plaintiff's testimony and in the third party reports.

Although the ALJ mentioned the third party reports, her disregard of this important evidence is contrary to the guidance of SSRs 12-2p and 06-3p and is not supported by the evidence. The ALJ cited "inconsistency" with the other evidence as the reason for discounting the weight attributable to the witness statements (Tr. 17). However, as discussed below, the alleged inconsistency is not supported by the record and is based on selecting isolated statements from the voluminous record. In fact, the witness reports dovetail with reports Plaintiff made to her providers and provides the background and support contemplated by SSR 12-2p. The ALJ's failure to properly evaluate this evidence is harmful error.

Taken together, the ALJ's treatment of Plaintiff's back impairments and her fibromyalgia result in a greater degree of error than either would standing alone. The combined effects of Plaintiff's fibromyalgia, multiple back impairments, obesity, and even her psychological conditions result in exponentially worse pain, fatigue, and limitations than the sum of each considered separately. Plaintiff's medical picture is complex and was not fully developed when the State agency doctors looked at it. For many reasons, but especially for purposes of the Listing, the ALJ should have consulted a medical expert to determine whether the combined effects of the multiple conditions was medically equal in severity to a Listing,

particularly Listing 1.04. Remand is necessary to obtain such evidence.

Next, the Plaintiff argues that the ALJ failed to properly evaluate her credibility.  Plaintiff claims that the ALJ neglected to consider important factors in evaluating credibility as required by the regulations, Circuit precedent and SSR 96-7p.

To enable this Court to properly evaluate the legal and factual support for the Commissioner's decision, the ALJ must articulate a legitimate (even if minimal) justification for the decision. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). Although the ALJ is not required to mention every piece of evidence, the written decision must "build an accurate and logical bridge from the evidence to [the] conclusion." *Id*. Plaintiff argues that the reasons offered by the ALJ for discounting Plaintiff's credibility are not "legitimate" reasons, that the ALJ failed to explain how her observations supported her conclusions, and that she omitted favorable credibility factors.

A review of the opinion and evidence reveals that the ALJ over- relied on common daily activities as evidence of the ability to work (Tr. 17). Thereby, she has committed a common legal error by failing to recognize "[t]he critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter, can get help from other persons . . . . . The failure to recognize these differences is a recurrent, and deplorable, feature of opinions by administrative law judges in social security disability cases." *Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir.2012); *Gentle v. Barnhart*, 430 F.3d 865, 867-68 (7th Cir.2005); *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 248-49 (6th Cir.2007). As with many claimants, Plaintiff must do things for herself despite the pain she experiences and she has learned to accomplish tasks in a manner that minimizes her suffering,

but likely would not be appropriate in a job setting. The Seventh Circuit has recognized that even persons who are disabled learn to cope with their impairments. *See Gentle*, 430 F.3d at 867. Reliance on activities of daily living as a negative credibility factor is particularly egregious in this case where Plaintiff's therapist has noted that she has a history of self-harm and was engaging in daily activities to induce "pain caused by excessive physical strains on her body" (Tr. 930). This evidence shows that even if she was engaging in daily activities that were "inconsistent" with her physical conditions, it was clinically pathological and a symptom of her mental impairments. Clearly, the ALJ should not hold the symptoms of the impairment against Plaintiff.

Additionally, the ALJ did not mention Plaintiff's good work history. A "claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." *Hill v. Colvin*, No. 15-1230, 2015 WL 7785561, at *5 (7th Cir. 2015) (quoting *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983)); *see Singletary v. Sec'y of Health, Educ. & Welfare*, 623 F.2d 217, 219 (2d Cir. 1980) (explaining that claimant's history of performing demanding work over long hours "justifies the inference that when he stopped working he did so for the reasons he testified to"); *Allen v. Califano*, 613 F.2d 139, 147 (6th Cir. 1980) (claimant's significant work history "demonstrated a considerable inclination toward employment"). Before she began having significant health problems, Plaintiff was earning over $35,000 per year (Tr. 133). If she received disability benefits, she would get approximately $1,500 per month (Tr. 137). Receipt of disability benefits would not be a windfall to this hardworking individual.

Moreover, the ALJ engaged in multiple instances of unacceptable cherry picking. *See Scott v. Astrue*, 647 F.3d 734, 740. (7th Cir. 2011). For example, the ALJ cherry-picked parts from Plaintiff's former employer's reports that supported her conclusions while

ignoring parts of the same evidence showing years of Plaintiff exhausting her FMLA eligibility and receiving disciplinary warnings due to medical absences (Tr. 177-84, 195-203, 224-36). She also emphasized one report Plaintiff reporting "regularly" walking her dog and using a treadmill (Tr. 637), while ignoring contemporaneous statements indicating that she was unable to sustain such activities (Tr. 924). The ALJ also ignored evidence of a prescription cane (Tr. 934) and a back brace (Tr. 671) while focusing on isolated statements about activities.

Another instance of the ALJ relying upon questionable evidence is the ALJ's decision to afford more weight to the opinion of the human resource director from Plaintiff's former employer despite that opinion being inconsistent with the other substantial evidence of the record. The human resource director did not believe Plaintiff had a serious back condition, calling her reason for being absent an "alleged back ailment" despite Plaintiff's well-documented surgeries and ongoing pathology in her back (Tr. 195). While the record does not reveal a motive for the witness's apparent hostility, the fact that she disbelieved Plaintiff had a true back impairment detracts significantly from the value of her opinion, particularly when weighed against the other lay opinions and observations from treating sources in the voluminous record. The ALJ's reliance upon it is yet another example of unacceptable cherry-picking. *See Id.*

Likewise, the ALJ did not mention or consider the financial barriers Plaintiff faced in obtaining even basic treatment (Tr. 429, 912, 931, 953, 960), let alone specialized orthopedic care and pain management. *See* SSR 96-7p; *Craft v. Astrue*, 539 F.3d 668, 678-79 (7th Cir. 2008) ("An inability to afford treatment is one reason that can 'provide insight into the individual's credibility.'").

Finally, the ALJ failed to consider the combined effects of Plaintiff's impairments—

particularly her obesity—upon the severity of her symptoms and limitations. Social Security Ruling 02-1p requires an ALJ to consider the exacerbating effects of a claimant's obesity on her underlying conditions. *Hernandez v. Astrue*, 277 F. App'x 617, 623-24 (7th Cir. 2008) (citing SSR 02-1p; *see also Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005) (finding that, even if obesity is not a severe impairment itself and "merely aggravates a disability caused by something else[,] it still must be considered for its incremental effect on the disability"). In this case, the ALJ concluded that Plaintiff's obesity was a severe impairment, making it especially important that she consider the limitations caused by the combination. Obesity exacerbates multiple aspects of health, including chronic diseases of the musculoskeletal system and mental health. SSR 02-1p ("Obesity may also cause or contribute to mental impairments such as depression. The effects of obesity may be subtle, such as the loss of mental clarity and slowed reactions that may result from obesity-related sleep apnea."). The ALJ did not discuss whether she believed the obesity exacerbated the other severe and non-severe impairments, which violates SSR 01-2p and requires remand.

Overall, the ALJ gave few reasons for discounting Plaintiff's credibility and offered little analysis to support those reasons. Such a scant and conclusory discussion does not constitute the type of findings required to demonstrate findings that are tied by a logical bridge to substantial evidence.

Plaintiff also argues that the vocational findings are founded upon legal error and are not supported by substantial evidence. The Commissioner bears the burden at step five of "providing evidence" demonstrating that other work exists in significant numbers in the national economy that the claimant can do given the residual functional capacity, age, education, and work

experience. *See* 20 C.F.R. § 416.912(g) and 416.960(c); *Britton v. Astrue*, 521 F.3d 799, 803-804 (7th Cir. 2008). When testimony from a vocational expert is proffered to satisfy that burden, the testimony must be reliable. *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002). If the vocational testimony is not reliable, it cannot be used as evidence to support a disability decision. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).

To elicit reliable evidence from a vocational expert, an ALJ must pose hypothetical questions that include all limitations supported by the medical evidence in the record. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 620 (7th Cir. 2010); *Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009). The ALJ must include limitations caused by the non-severe impairments in formulating the RFC. *See Totton v. Colvin*, No. 1:14-cv-00510-DML-JMS (S.D. Ind. Sept. 1, 2015) (unpublished) (citing *Denton v. Astrue*, 596 F.3d 419, 423 (7th Cir. 2010) ("When determining a claimant's RFC, the ALJ must consider the combination of all limitations on the ability to work, including those that do not individually rise to the level of a severe impairment.")).

In the present case, the ALJ determined that Plaintiff had severe impairments including discogenic back, fibromyalgia, obesity, and headaches/migraines (Tr. 14). She further concluded that Plaintiff's incontinence and post-traumatic stress disorder (PTSD) were not medically determinable impairments (Tr. 14-15). She also determined that Plaintiff's medically determinable depression/cyclothymic disorder did not cause more than minimal limitation in her ability to perform basic mental work activities and was, therefore, nonsevere (Tr. 15). However, she did not consider Plaintiff's chronic pain syndrome (Tr. 382, 410, 661, 733, 813, 818, 964); mild sleep apnea (Tr. 655, 658); chronic sinus disease (Tr. 420, 518-22, 544-48, 652, 691, 697,

716); and hypothyroidism (Tr. 621, 638, 913). There is nothing in the decision that reflects consideration of the non-severe impairments in the RFC formulation.

The lack of consideration is particularly egregious in regard to the psychological limitations. The ALJ found that Plaintiff had mild difficulties maintaining concentration, persistence, or pace. Although the ALJ found mild limitations, she failed to account for ways in which Plaintiff's limitations interfered with her ability to maintain activities requiring concentration, persistence, or pace. A finding of mild limitations is not the same as a finding of no limitations. The impact of this omission is evident when considered in conjunction with the POMS directive to adjudicators to consider a claimant's stamina and endurance in evaluating RFC. See DI 24510.005, DI 24510.057. A claimant's RFC must reflect activities that the claimant can sustain for an 8-hour workday and a 5 day workweek (with normal breaks). Evaluation of stamina and endurance must include consideration of the objective medical test results and physical findings, the characteristic effects of the disease or disorder, the effects of treatment, reports of daily activities, lay evidence, recorded observation, the effects of symptoms, and precipitating and aggravating factors for fatigue. DI 24510.005. Evaluation of an individual's mental performance must include consideration of the ability to maintain adequate mental functioning throughout a full workday. DI 24510.061. In appropriate cases, "Inability to sustain a 40-hour workweek is an RFC finding." DI 24510.057. The ALJ failed to consider Plaintiff's stamina and endurance to maintain concentration, persistence, or pace and instead focused on her ability to perform discreet tasks for unspecified periods of time. That unrealistic approach is error.

Because the residual functional capacity finding is not supported by substantial evidence,

the hypothetical question paralleling that finding was faulty and the resulting vocational

testimony is not reliable evidence of whether there exist a significant number of jobs in national

economy for a person with all of Plaintiff's credible limitations. Thus, for this additional reason,

remand is required.

Conclusion

On the basis of the foregoing, the decision of the Commissioner is hereby REMANDED.


 Entered: July 25, 2016 .


s/ William C.  Lee    
William C. Lee, Judge
United States District Court